IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 10-00149-01-CR-W-HFS |
| | ) | |
| EDWARD J. GOLDEN, JR., | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION TO DENY DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE AND ORAL
MOTION TO SUPPRESS STATEMENTS**

Before the court are Defendant's motions to suppress evidence and statements related to the December 3, 2008, search of his automobile. Defendant moves the Court to suppress the handgun seized from his automobile, arguing that the warrantless search was neither constitutionally permissible incident to his arrest nor pursuant to the automobile exception. Defendant also seeks to suppress the statement he made to officers at the scene on grounds that he had not been advised of his Miranda rights. Lastly, Defendant argues his December 4, 2008 statement to Detective Campo should be suppressed as fruit of the poisonous tree.

*I. BACKGROUND*

On December 3, 2008, Kansas City, Missouri Police Department Detective Dennis Paquette was conducting surveillance for an operation in which an informant purchased narcotics from Mark Crosby. During the course of conducting surveillance, Detective Paquette came to believe Defendant may also be involved in narcotics trafficking. This belief caused Detective Paquette to request that

1

Defendant be identified. Kansas City, Missouri Police Officers Mark Johnson and Luke Little received Detective Paquette's request. They ultimately made contact with Defendant and learned Defendant had an outstanding warrant and was a felon. Defendant admitted to Tactical Officer Robert Evans that there was a gun in the car. A search of Defendant's car revealed a handgun underneath the driver's seat. Defendant gave a statement to Detective Campo on December 4, 2008 regarding the handgun found in his car.

An indictment was returned on May 25, 2010, charging Defendant with being a felon in possession of a firearm. On July 14, 2010, Defendant filed a motion to suppress evidence (Doc. No. 9). The government responded to Defendant's motion on July 30, 2010 (Doc. No. 17). I conducted an evidentiary hearing on August 31, 2010. The government appeared by Assistant United States Attorney Christina Tabor. Defendant was present, represented by appointed counsel Ronna Holloman-Hughes. The government called Kansas City, Missouri Police Officers Mark Johnson and Robert Evans, as well as Kansas City, Missouri Police Detective Dennis Paquette to testify. Defendant testified on his own behalf.

The following exhibits were marked and admitted into evidence:

| | |
|---|---|
| Government's Exhibit 1: | Photo of 7310/7312 Prospect, Kansas City, Missouri |
| Government's Exhibit 3: | Photo of 7310/7312 Prospect, Kansas City, Missouri - View from north side of building |
| Government's Exhibit 4: | Photo of Armscor, .45 caliber pistol, Serial Number AP27755 |
| Government's Exhibit 5: | Close up photo of Armscor, .45 caliber pistol, Serial Number AP27755 |
| Government's Exhibit 6: | Copy of Kansas City, Missouri Police Department Tow Report |
| Government's Exhibit 7: | Miranda Waiver |
| Government's Exhibit 8: | Statement |
| | |
| Defendant's Exhibit 11: | Photo of second car in shop |
| Defendant's Exhibit 14: | View of inside shop with a motorcycle |

>    Defendant's Exhibit 16:    Department of Revenue registration
>    Defendant's Exhibit 17:    DA - 3334 Plates
>    Defendant's Exhibit 18:    DA - 3295 Plates

At the conclusion of the hearing, I allowed the parties additional time to submit briefing on Defendant's statement to law enforcement officers at the scene. Defendant filed supplemental briefing on September 13, 2010 (Doc. No. 34) and the government responded on September 29, 2010 (Doc. No. 39).

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact.

1. Dennis Paquette has been a detective with the Kansas City, Missouri Police Department for approximately five years (Tr. at 25). He has worked as a narcotics investigator the entire time (Tr. at 25-26). In this capacity, Detective Paquette has been to several trainings, including DEA school and surveillance school at Camp Dodge, Iowa, pertaining to purchasing narcotics and conducting surveillance (Tr. at 26-27). He has personally conducted approximately 500 hand-to-hand narcotics transactions and discussed these experiences with other similarly-experienced law enforcement members (Tr. at 26). Detective Paquette is also experienced in controlling confidential informants who purchase narcotics, having been involved in approximately 500 such operations (Tr. at 27). He has personally conducted over 1,000 surveillance operations associated with drug deals (Tr. at 27).

2. Detective Paquette testified that "hand-to-hand" drug transactions generally entail contacting a narcotics trafficker in advance, arranging a transaction, and meeting in person to conduct

3

the transaction (Tr. at 27). The transaction itself usually takes less than a couple of minutes (Tr. at 28). It is common for narcotics traffickers to sit in a car with somebody else for a few minutes (Tr. at 36-37). The buyer and seller meet, talk, agree on the price and quantity, make the exchange and go their separate ways (Tr. at 28, 29). Often, the parties to the transaction attempt to conceal their activity from law enforcement through a handshake, leaning in somewhere, dropping something in a seat and/or picking something up (Tr. at 28). Many times, the seller sets up consecutive meetings at the same location (Tr. at 29).

3. On December 3, 2008, Detective Paquette was conducting surveillance for a confidential informant purchase (Tr. at 29). He began surveilling 1221 Brooklyn Avenue at approximately 11:50 a.m. (Tr. at 29-30). The informant purchased narcotics from Mark Crosby; Mr. Crosby then left the location and arrived at an apartment at Truman and Brooklyn at approximately 12:05 p.m. (Tr. at 31). Detective Paquette observed Mr. Crosby on a cell phone (Tr. at 32, 41). Shortly thereafter, a black male exited an apartment, walked up to Mr. Crosby's car, conducted what was believed to be a narcotics transaction, and reentered his apartment (Tr. at 32-33). Mr. Crosby then traveled to Prospect (Tr. at 33). At approximately 12:40, he parked north of the building located at 7310-7312 Prospect (Tr. at 34). Mr. Crosby exited his car and entered the passenger's seat of a blue Cadillac parked directly in front of The Kandy Shop located at 7310-7312 Prospect, made contact with the individual sitting in the driver's seat, talked to and shook hands with the individual (Tr. at 34-36, 37, 39, 41). Detective Paquette could not tell if Mr. Crosby had anything in his hand and did not observe Mr. Crosby give the individual money (Tr. at 40, 52). Mr. Crosby was inside the Cadillac approximately five minutes, then exited the car and left the area (Tr. at

4

34, 36, 41-42). Detective Paquette did not observe Mr. Crosby to have a package when he exited the Cadillac (Tr. at 52)

4. The Cadillac had a drive-away tag on it, bearing the number "DA-3334" (Tr. at 34, 37).

5. The individual sitting in the driver's seat of the Cadillac remained after Mr. Crosby left (Tr. at 36). Detective Paquette felt this was unusual since the business in front of which the vehicle was parked was open (Tr. at 36, 37). He thought the individual may be waiting for someone else (Tr. at 36). Detective Paquette testified he believed that the individual in the Cadillac may have been Mr. Crosby's supplier and that they may have been arranging further meetings, discussing prices or other topics related to narcotics trafficking (Tr. at 49, 51, 54).

6. Based on these observations, Detective Paquette conducted a radio check of the Cadillac's license plate (Tr. at 34). The check revealed there was no local record and that it was not on file as being a registered plate through the Missouri Department of Revenue (Tr. at 34-35). There were no warrants associated with the plate (Tr. at 40).

7. Drive-away plates are registered immediately and only good for one year (Tr. at 35). They are common for autobody shops, and are designed for one business to take the vehicle on which the plate is affixed to another business (Tr. at 35, 48, 51). Drive-away plates are not intended for general driving purposes (Tr. at 35, 48). The tags are not supposed to be left on a vehicle (Tr. at 48).

8. The individual waiting inside his car in front of an open business, coupled with the fact that the car had unregistered drive-away tags, caused Detective Paquette to request a car check on the Cadillac so that the individual inside could be identified (Tr. at 36).

9. Detective Paquette maintained surveillance on the Cadillac until district officers arrived (Tr.

at 37, 43). He did not observe the individual smoke anything or throw anything out of the car's window during this time (Tr. at 43-44).

10. Kansas City, Missouri Police Officers Mark Johnson and Luke Little received Detective Paquette's call (Tr. at 5-6, 12). Detective Paquette told the officers there was a problem with the vehicle's tags and about the suspected narcotics transaction (Tr. at 6, 12-13, 42, 101-102).

11. Officers Johnson and Little ultimately approached the area of 7310-7312 Prospect and observed the vehicle in question (Tr. at 6).

12. As the officers got close, they activated their patrol car's overhead lights and ran a check on the Cadillac's license plate (Tr. at 10). The license plate check revealed there to be no record on file, which is a traffic violation (Tr. at 10, 13, 14). Officer Johnson testified that drive-away tags generally come back on file (Tr. at 14).

13. Officers Johnson and Little pulled behind the Cadillac and stopped (Tr. at 10, 14). Defendant was the Cadillac's lone occupant was seated in the driver's seat (Tr. at 10). As soon as the officers stopped, Defendant exited the Cadillac, walked around the back of the car and started to walk toward The Kandy Shop (Tr. at 10, 14-15). The officers exited their patrol car and made contact with Defendant near the Cadillac's rear passenger door (Tr. at 10-11, 14).

14. Officers Johnson and Little obtained Defendant's name and ran a computer check (Tr. at 11). Defendant was not free to leave the scene (Tr. at 18). Defendant's name responded back with a Kansas City non-moving violation warrant and indicated Defendant was a felon (Tr. at 11, 20). Officer Johnson testified that he and Officer Little stood with Defendant the entire time; neither Officer Johnson nor Officer Little searched Defendant's car (Tr. at 100-

6

101, 102-103).

15. Officers from the Tactical Unit responded to the scene and Tactical Officer Robert Evans arrested Defendant on the outstanding warrant (Tr. at 12, 18, 20, 59-60). Officers Johnson and Little turned all investigations over to the Tactical Unit (Tr. at 19).

16. Officer Evans told Defendant they were going to conduct a custodial search of his car and asked Defendant if there was anything in the car that could hurt them (Tr. at 60, 67). Officer Evans did not first advise Defendant of his <u>Miranda</u> rights (Tr. at 67). Defendant responded that there was a gun in the car (Tr. at 60).

17. Tactical Officer Weinhold conducted a search of the car (Tr. at 60). An Armscor .45 caliber handgun, serial number AP92775, was recovered from underneath the driver's seat (Tr. at 60-61; Gvt. Exhs. 4, 5). The handgun had one .45 magazine in it and nine live rounds in the magazine (Tr. at 61, 95). Officers did not locate any drugs, drug paraphernalia, or currency (Tr. at 44, 68-69).

18. Defendant was also searched. Officers did not find any money on Defendant's person (Tr. at 53).

19. Defendant's car was towed subsequent to his arrest (Tr. at 44, 62, 63, 68; Gvt. Exh. 6). Detective Paquette and Officer Evans testified that the decision to tow the car was in accordance with the Kansas City, Missouri Police Department's policies and procedures on towing (Tr. at 46, 62-63, 68).

20. Defendant owns the "The Kandy Shop," which is an autobody shop (Tr. at 51, 71, 75; Gvt. Exh. 8). Defendant testified he utilizes drive-away tags in connection with this business (Tr. at 75). He buys cars at auctions to fix and sell, and is required to have a plate on the car(s)

if parked in front of his business (Tr. at 75, 76-77). In 2008, Defendant's drive-away plate numbers were DA-3334 and DA-3295 (Tr. at 76; Def. Exhs. 17-18). These tags were each registered for one year (Tr. at 76; Def. Exh. 16).

21. Defendant testified that he was having lunch in his car on December 3, 2008 at approximately 12:00 p.m. (Tr. at 71, 82). Defendant does not have heat in his body shop, so heats the building with kerosene; he ate lunch in his car to avoid the kerosene smell (Tr. at 71).

22. While Defendant was eating lunch, Mr. Crosby stopped by to discuss the motorcycle Defendant was fixing for him (Tr. at 71-72).

23. Defendant noticed a marked police car with its lights on after Mr. Crosby left (Tr. at 74, 83). Defendant testified he did a lot of business with the police in the neighborhood and thought it was an officer named "Kara" (Tr. at 74). Defendant stated he got out of the car and walked to the back of the car to greet her, at which time he realized it was two other officers (Tr. at 74, 83-84).

24. Defendant testified that Officer Johnson met him at the trunk of the Cadillac, grabbed him, put Defendant's hands behind his back, and stated he was doing so for his safety; Officer Little ran to the car and started searching it (Tr. at 74-75, 77, 84-88). According to Defendant, Officer Little stated, "Gun," and Defendant was handcuffed (Tr. at 77, 87-90).

25. Defendant testified that he acknowledged the gun was his (Tr. at 77). He also testified at the suppression hearing that the .45 caliber gun was in the car underneath the driver's seat (Tr. at 90-91).

26. The officers did not ask Defendant anything further about the gun, but did ask if there was

anything else in the car to which he responded "no" (Tr. at 77, 88). Defendant testified neither officer ever asked him to identify himself (Tr. at 92-93). Defendant reported he was held until a paddy wagon came, at which time he was placed in the wagon (Tr. at 77).

27. Defendant testified that while he was in the paddy wagon, an officer approached him and asked for permission to search The Kandy Shop (Tr. at 78, 93-94). Defendant consented, opened the door for officers and accompanied them during the search (Tr. at 78, 94). The search did not reveal any contraband (Tr. at 78, 94).

28. On December 4, 2008, Defendant gave a statement to police regarding the handgun found in his car (Tr. at 78; Gvt. Exhs. 7, 8). He did so after being advised of his <u>Miranda</u> rights and signing a waiver (Tr. at 80-81; Gvt. Exh. 7).

29. Defendant told Detective Campo that he got the handgun from a friend after Defendant's daughter had been kidnapped approximately six weeks prior (Tr. at 79; Gvt. Exh. 8). He stated he had been threatened four days before his daughter was kidnapped and got the gun for protection (Tr. at 79; Gvt. Exh. 8).

### III. LEGAL ANALYSIS

Defendant seeks to suppress the evidence seized from his vehicle during the December 3, 2008 warrantless search of his car. He also seeks to suppress his statement on the scene that there was a gun in the car due to the fact that he had not been <u>Mirandized</u>. Based on these alleged violations, Defendant argues that his December 4, 2008 statement to Detective Campos should be suppressed as fruit of the poisonous tree. Each argument will be addressed in turn.

#### A. SEARCH OF DEFENDANT'S VEHICLE

Defendant contends that the warrantless search of his car does not fall within the automobile

9

exception and was not a permissible search incident to arrest. Specifically, Defendant argues that officers did not have probable cause to believe his car contained evidence of illegal activity. He also argues that Arizona v. Gant, 129 S. Ct. 1710, 1716 (2009), invalidates the search as a search incident to arrest as Defendant was outside of his car when arrested.

Law enforcement officers may lawfully conduct a stop upon reasonable suspicion of criminal activity. United States v. Coleman, 603 F.3d 496, 499 (8th Cir. 2010); see also United States v. Hughes, 517 F.3d 1013, 1016 (8th Cir. 2008)("Where a police officer has a reasonable suspicion that criminal activity may be afoot, the officer may briefly stop an individual and make reasonable inquiries aimed at confirming or dispelling the suspicion."). "In determining whether an officer had a 'particularized and objective basis for suspecting legal wrongdoing,' reviewing courts must look at the totality of the circumstances, allowing officers to draw on their experience and training." Coleman, 603 F.3d at 499 (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)). Even in instances where an officer "cannot see an actual drug exchange, the totality of circumstances may still give rise to reasonable suspicion." Coleman, 603 F.3d at 500. "The collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed . . . when there is some communication between the officers." United States v. Thompson, 533 F.3d 964, 969 (8th Cir. 2008).

In this case, the totality of the circumstances demonstrate reasonable suspicion existed for Officers Johnson and Little to stop Defendant. Detective Paquette had observed Mr. Crosby sell narcotics to a confidential informant. Following the transaction, he followed Mr. Crosby to 7310-7312 Prospect and observed Mr. Crosby enter a car, shake hands and talk with Defendant who was inside the car, and ultimately leave the area. Detective Paquette testified at the suppression hearing

that these behaviors are common for narcotics traffickers. Defendant remained in the car after Mr. Crosby left. Detective Paquette testified this was unusual due to the business in front of which the vehicle was parked being open and believed that Defendant may have been waiting for someone else to arrive and could be Mr. Crosby's supplier. Detective Paquette conveyed information about the suspected narcotics transaction between Mr. Crosby and Defendant to Officers Johnson and Little. The officers were, therefore, justified in stopping Defendant.

Once Officers Johnson and Little made contact with Defendant, obtained his name, and ran a computer check. The check revealed Defendant had an outstanding warrant. Defendant was lawfully arrested on the warrant. Officers from the Tactical Unit then responded to the scene and took over the investigation. As stated above, Defendant argues that the subsequent search of his car was prohibited by Arizona v. Gant.

The Supreme Court decided Arizona v. Gant on April 21, 2009. In its opinion, the Court held that a search incident to arrest was unconstitutional when the arrestee had been secured and could no longer access the interior of the vehicle. 129 S. Ct. 1710. While Defendant is correct that the December 3, 2008, search of his car would be constitutionally impermissible under Gant, the Western District of Missouri and other trial courts within the Eighth Circuit have declined to apply Gant retroactively. Specifically, courts have found "that for searches conducted prior to the Gant decision . . . the previous state of the law controls as the officers were operating in good faith reliance on the law as it existed prior to Gant." United States v. Harris, No. 09-00385-01-CR-W-DGK, 2010 WL 2265454 at *6 (W.D. Mo. Apr. 22, 2010). See also United States v. Allison, 637 F. Supp. 2d 657, 673-74 (S.D. Iowa 2009); United States v. Lee, No. 07-04050-01-CR-C-NKL, 2009 WL 3762404 at *2 (W.D. Mo. Nov. 10, 2009); United States v. Gray, No. 4:09CR3089, 2009 WL

11

4739740 at *7 (D. Neb. Dec. 7, 2009). Here, Defendant's arrest occurred prior to the Gant opinion. The arresting officers were thus justified in relying on pre-Gant Eighth Circuit precedent that would have allowed the search. See United States v. Barnes, 374 F.3d 601, 604 (8th Cir. 2004)("The lawfulness of the search does not depend on whether the occupant was actually capable of reaching the area during the course of the police encounter. . . . As long as an occupant could have reached an area while inside the vehicle, then the police may search that area incident to a lawful arrest."). Defendant's motion to suppress evidence should be denied on this basis.

Even if the officers' reliance on pre-Gant precedent were unreasonable, the search of Defendant's car would still be constitutionally permissible under the inevitable discovery doctrine. Evidence may be admissible under the inevitable discovery doctrine if the government proves "by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." United States v. Glenn, 152 F.3d 1047, 1049 (8th Cir. 1998)(quoting United States v. Conner, 127 F.3d 663, 667 (8th Cir. 1997)).

In this case, both prongs are satisfied. The officers were actively investigating Defendant. They obtained Defendant's name, ran a computer check and learned Defendant had an outstanding warrant and was a felon. Defendant was placed under arrest. Kansas City Missouri Police Department policy allows officers to tow a vehicle in connection with a felony arrest. Officers may also conduct an inventory search of the vehicle prior to it being towed. United States v. Engler, 521 F.3d 965, 971 (8th Cir. 2008)("It is permissible for an officer to conduct an inventory search pursuant to department policy prior to a vehicle being towed, protecting both the vehicle owner and

the officers."). Detective Paquette and Officer Evans both testified that towing Defendant's car was authorized by the Kansas City, Missouri Police Department's policies. Id. at 972 ("An officer's testimony that the inventory search was performed within the police department's policy is sufficient."). Defendant's motion to suppress evidence should be denied.

## B. DECEMBER 3, 2008 STATEMENT

Defendant maintains his December 3, 2008 statement that there was a gun in his car should be suppressed as he was not Mirandized before being questioned. I disagree.

"Under the public safety exception, a suspect's answer may be admitted into evidence if it was obtained in response to a question asked in furtherance of public safety and not designed solely to solicit testimonial evidence, even if Miranda warnings had not yet been given." United States v. Everman, 528 F.3d 570, 572 (8th Cir. 2008)(citing New York v. Quarles, 467 U.S. 649, 655-56 (1984)). Those being protected under this exception "can include the officers themselves." Everman, F.3d at 572 (citing Quarles, 467 U.S. at 658 n.7). In United States v. Liddell, the Eighth Circuit stated:

> Our prior cases recognized the risk of police officers being injured by the mishandling of unknown firearms or drug paraphernalia provides a sufficient public safety basis to ask a suspect who has been arrested and secured whether there are weapons or contraband in a car or apartment that the police are about to search.

517 F.3d 1007, 1009-10 (8th Cir. 2008).[1]

Much like Liddell, Officer Evans in this case asked Defendant if there was anything in the car that could hurt them. As reasoned by the Eighth Circuit in Everman, this question was not designed to elicit testimonial evidence from Defendant but, rather, to ensure the safety of the officers

---

[1] In Liddell, upon finding one gun in the defendant's vehicle officers asked, "Is there anything else in there we need to know about?" "That's gonna hurt us?". 517 F.3d at 1008.

13

searching Defendant's car. Officer Evans, accordingly, was not required to <u>Mirandize</u> Defendant before asking him this question. Defendant's oral motion to suppress his December 3, 2008 statement that there was a gun in the car should be denied.

### C. DECEMBER 4, 2008 STATEMENT

Defendant contends that his December 4, 2008 statement to Detective Campo should be suppressed as fruit of the poisonous tree. Because neither the search of Defendant's car nor Officer Evans' question to Defendant were constitutionally impermissible, this argument has no merit. Defendant's motion to suppress should be denied on this ground.

### IV. CONCLUSION

For the above-stated reasons, it is

RECOMMENDED that the Court, after making an independent review of the record and the applicable law, enter an order denying Defendant's motions to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has fourteen days from the date of this report and recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
November 3, 2010